IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEJAN K., | ) |
| | ) |
|        Plaintiff, | ) |
| | )   No. 18 C 7518 |
|        v. | ) |
| | )   Magistrate Judge Jeffrey Cummings |
| ANDREW SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|        Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Claimant Dejan K. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied his application for a period of disability and Supplemental Security Income ("SSI") under the Social Security Act. 42 U.S.C. §§416(i), 402(e), and 423. The Commissioner has brought a cross-motion for summary judgment seeking to uphold the Social Security Agency's ("SSA") decision finding that Claimant is not disabled. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, Claimant's motion for summary judgment (Dckt. #13) is granted and the Commissioner's cross-motion for summary judgment (Dckt. #21) is denied.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Dejan K. as Claimant.

1

I.  BACKGROUND

    A.    **Procedural History**

On March 25, 2015, Claimant filed a disability application alleging a disability onset date of March 5, 2014. His claim was denied initially and upon reconsideration. On December 13, 2017, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. The Appeals Council denied review on September 21, 2018, making the ALJ's decision the Commissioner's final decision. 20 C.F.R. §404.985(d); *see also Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the District Court on January 18, 2019.

    B.    **Medical Evidence**

        1.    **Evidence from Claimant's Treatment History**

Claimant fell from a roof in 2008 and subsequently underwent extensive treatment for back pain, head and neck pain, and anxiety-related problems. Claimant's complaints of "brain fog" and severe cervical pain led neurologist Dr. Marcello Cherchi to find that Lyme disease was the most likely explanation for Claimant's various complaints. For the most part, however, doctors focused on objective tests showing damage to Claimant's spine. A June 2014 EMG showed a pre-existing S1 radiculopathy in his lumbar spine but no other abnormality. An MRI of the lumbar spine in July 2014 showed an L5-S1 disc herniation. On January 7, 2015, Claimant received facet injections in his neck that resulted in intermittent improvement. Claimant followed multiple treatment modalities from a wide array of treaters but experienced only limited relief from his complaints.

The record shows that from the alleged onset date onwards, Claimant's physical condition was heavily intertwined with his psychological status. In June 2014, Claimant visited

the Mayo Clinic in Rochester, Minnesota for a full evaluation. Dr. V.D. Garovic concluded that his condition presented a "complex situation" that required further study – including psychiatric evaluation – and that Claimant's anxiety could be contributing to his physical pain. (R. 586). Dr. Tim Lamer at the Mayo Clinic also noted that Claimant's symptoms had progressed to the point that he was "now essentially disabled and becoming almost housebound." (R. 572). Since multiple tests and examinations had failed to provide a diagnosis, Dr. Lamer concluded that Claimant could be suffering from chronic pain syndrome.[2] (R. 574).

Claimant also underwent evaluation at the Rehabilitation Institute of Chicago in February 2015. The examination included a psychological evaluation showing that Claimant had a significantly higher-than-average indication of depression, was experiencing panic attacks, and that his pain was affected by psycho-social factors. (R. 479). This assessment took place at the direction of Dr. Randy Calisoff, who diagnosed Claimant with a mood disturbance as well as "diffuse myofascial pain syndrome secondary to central sensitization." (R. 476). Dr. Calisoff recommended that Claimant spend two months working on his psychological issues before being admitted to a "full day pain program." (R. 477).

Claimant sought some treatment the same month with psychiatrist Dr. Marcia Sawa, who noted that he displayed multiple difficulties. In particular, Claimant refused to exercise because it "interferes with muscles and blood flow," he slept only five hours a night, and he showed a "severely obsessional thought process." (R. 489). Indeed, Claimant was so focused on his pain that Dr. Sawa concluded that he displayed a "near psychotic fixation on physical symptoms."

---

[2] Chronic pain syndrome is "marked by pain that lasts longer than six months and is often accompanied by anger and depression, anxiety, loss of sexual desire, and disability." The "syndrome appears to be linked to abnormalities in the interaction between certain glands . . . and the nervous system, known as a type of stress axis." http://www.columbianeurology.org/neurology/staywell/document.php?id=42106 (last visited Oct. 12, 2020).

(R. 490). On May 12, 2015, Claimant received additional psychiatric treatment from Dr. Andrew Beatty. Dr. Beatty noted that Claimant reported a history of "bizarre medication reactions" and diagnosed him with a panic disorder. The next day, Dr. Albert Nguyen expanded on Dr. Beatty's remark by noting that Claimant stated that the medication Neurontin made it impossible for him to digest food, and that he was still having panic symptoms two weeks after one dose of Prednisone allegedly created a panic attack. (R. 538). Dr. Nguyen concluded that Claimant had a generalized anxiety disorder with a "tendency to ruminate and intellectualize his reactions." (R. 541).

In August 2015, Claimant began treatment with psychiatrist Dr. Robert Shulman at Rush University Medical Center. Like Claimant's other treaters, Dr. Shulman noted that he was preoccupied with his physical state and diagnosed Claimant with depression and a pain disorder. He prescribed a low dose of the anticonvulsant medication Lamotrigine "to gain control of [a] highly reactive CNS [central nervous system] circuitry." (R. 297). Claimant only took the medication for ten days because it gave him "heart flutters" and asked for name-brand Zoloft because he thought that the generic version of that antidepressant made his anxiety and pain worse. By October 2015, Dr. Shulman noted that Claimant "remains hugely hypochondriacal and somatically focused." (R. 301). The last entry dated December 8, 2015 contains diagnoses of a depressive disorder, an anxiety disorder, and a pain disorder. (R. 304).

### 2. Evidence From State-Agency Experts

The SSA determined that Claimant had the severe impairments of a spine disorder and migraine headaches but that his anxiety disorder did not constitute a severe impairment. (R. 73). On October 6, 2015, non-examining expert Dr. Charles Kenney found that Claimant could carry out a wide range of light work. He could lift 20 pounds occasionally and 10 pounds frequently

4

as well as sit, stand, or walk up to six hours each day. Claimant could climb stairs, kneel, stoop, balance, and crawl occasionally. (R 76-78). Dr. James Hinchen agreed with those findings upon reconsideration on January 27, 2016. (R. 94).

State-agency psychologist Dr. David Voss issued his evaluation of Claimant on October 4, 2015. He found that Claimant's anxiety disorder was not severe and that it imposed only mild restrictions on his activities of daily living ("ADLs"), social functioning, and ability to maintain concentration, persistence, or pace. (R. 73-74). On reconsideration, Dr. Richard Hamersma expanded Claimant's potential mental impairments to include an affective disorder, an anxiety disorder, and a somatoform disorder.[3] Nonetheless, he agreed with Dr. Voss that these impairments only imposed mild restrictions on Claimant's functioning. (R. 90).

### 3. Evidence From Examining and Treating Experts

Claimant saw a large number of medical experts in several states during his alleged disability period. Some provided standard expert reports while others made briefer assessments of Claimant's condition. On September 23, 2014, treating physician Dr. Robert Waters stated that Claimant was under his care for Lyme disease, adrenal insufficiency, and spondylitis. Claimant was currently off work due to "extreme pressure in his head" and lack of strength. Dr. Waters recommended that he remain off work until December 26, 2014 due to a herniated lumbar disk, cervical stenosis, and chronic pain syndrome.

Psychiatrist Dr. Henry Fine examined Claimant at the SSA's request and issued a report on August 12, 2015. Claimant told Dr. Fine that he began experiencing anxiety and panic

---

[3] "Somatic symptom disorder is characterized by an extreme focus on physical symptoms – such as pain or fatigue – that causes major emotional distress and problems functioning." https://www.mayoclinic. org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syx-20377776 (last visited Oct. 12, 2020).

attacks in November 2013. The attacks originally occurred each day but only arose every few weeks at the time of the exam. Dr. Fine noted that Claimant's mood was somewhat anxious but that he was cooperative. He was oriented and was able to engage in abstract thinking and calculations. Dr. Fine diagnosed claimant with "anxiety and panic secondary to a general medication condition" but also provided a medical diagnosis of myofascial pain syndrome. (R. 747-50).

 Dr. Roopa Karri also issued a report for Claimant on August 12, 2015 after examining him for the SSA. Claimant told Dr. Karri that he had difficulty in walking very far and that his neck felt stiff and painful. The pain makes him "very anxious" and medications do not help much with the pain. Claimant stated that steroids made him "insane" and that he was too anxious to allow Dr. Karri to take his blood pressure. Dr. Karri noted that Claimant could not walk with a tandem gait, could not heel/toe walk, and could not squat. His straight leg test was negative, and Claimant was able to walk 50 feet without support. Dr. Karri diagnosed him with (1) depression, anxiety, panic, and insomnia, (2) a history of bilateral ulnar neuropathy, (3) atlas subluxation with decreased range of motion, (4) hypertension, and (5) low back pain. (R. 752-54).

 On July 10, 2017, Claimant's treating psychiatrist Dr. Robert Shulman further reported that Claimant had no serious impairments in his ADLs but that his illness made him "more isolative and withdrawn" socially and that he was less able to tolerate social interactions. He had "poor task sustainability," "poor focus/concentration," and could only complete three out of five instructions. Claimant had a "poor" ability to adapt himself to work situations due to his pain, fatigue, and anxiety. (R. 1226-1231).

### 4. Evidence From Claimant's Testimony

Claimant appeared at the July 28, 2017 hearing and described his symptoms to the ALJ. He stated that pain in his lower back and cervical spine created headaches and made it difficult for him to sit for long periods of time. Claimant's headache pain averages seven to eight on a scale of one to ten. (R. 52). He has tried multiple treatment modalities from Botox injections to biofeedback and medications with few results. (R. 43).

For the most part, however, Claimant focused on his anxiety. He first experienced a panic attack as part of a colonoscopy exam that took place several years prior to the hearing. (R. 43). Claimant's panic can be triggered by a wide range of events including the smell of exhaust fumes, thunderstorms, high floors in buildings, and violence on television. (R. 43-44, 48). Claimant therefore carries Valium and Zoloft with him at all times. (R. 44). Claimant testified that his panic attacks had lessened in severity over the preceding two years; prior to that, even some medications would cause him to panic. (R. 45). Anxiety causes his upper body to become tense and painful and he needs up to three months to recover from each panic attack. (R. 46). Headache pain can become so great as a result of Claimant's anxiety that it feels as if his head will burst. (R. 43).

Plaintiff described his daily activities as severely limited. He is socially isolated due to pain and fatigue. Claimant sleeps very poorly, takes anxiety medication when he gets up in the morning, and then returns to bed. (R. 52). His wife cares for their children, and his mother helps out with other daily activities. (R. 53). Claimant does no house or yard work and is only able to spend small amounts of time with his children. (R. 53). He tries to go outside briefly each day but is fatigued after walking only one block. (R. 51).

C. **The ALJ's Decision**

The ALJ issued a decision on December 13, 2017 finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability decisions, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since his alleged onset date of March 5, 2014. His severe impairments at Step 2 were spinal derangement, depression, and an anxiety/panic disorder. The ALJ concluded at Step 3 that none of these disorders met or medically equaled a listing. As part of that analysis, the ALJ applied the "special technique" provided under 20 C.F.R. §1520a for evaluating the severity of mental impairments. The ALJ found that Claimant had a mild restriction in concentrating, persisting, or maintaining pace. He had moderate limitations in his ability to manage himself, in understanding, remembering, or applying information, and in interacting with others.

Before moving to Step 4, the ALJ evaluated Claimant's description of his symptoms. The ALJ determined that the record "partially" supported Claimant's testimony but that his alleged symptoms were otherwise "not entirely consistent" with the objective evidence. The ALJ also assigned weights to reports issued by Claimant's treaters. He gave "little" weight to psychiatrist Dr. Robert Shulman's treatment notes and "limited" weight to his expert report. The ALJ also gave limited weight to reports by Dr. Waters and Dr. Grasso. In addition, the ALJ assigned limited weight to the state-agency psychologists' findings that Claimant did not have a severe mental impairment and gave "some" weight to state-agency Dr. Kenney's RFC finding that Claimant could perform a wide range of light work. Instead, the ALJ found that Claimant could carry out a reduced range of light work as that exertional classification is described in 20 C.F.R. §414.1567(b). Claimant could only frequently climb ramps and stairs, kneel, crouch, and

8

crawl. He could occasionally stoop, climb ladders, ropes, or scaffolds. He would be limited to simple, routine tasks that involve only simple work-related decisions.

Based on these findings, the ALJ determined at Step 4 that Claimant could not perform his past relevant work as a software developer. The vocational expert ("VE") testified that jobs were available in the national economy for someone with Claimant's RFC. The ALJ relied on the VE's testimony to determine at Step 5 that Claimant was not disabled. (R. 15-24).

## II.     LEGAL ANALYSIS

### A.     The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the

9

individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a

10

claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

### III.　DISCUSSION

Claimant argues that the ALJ erred in his evaluation of Dr. Shulman's report and failed to account for all the evidence related to Claimant's headaches. The Court agrees with Claimant on both points. Since the second issue relates to both the ALJ's symptom analysis and the RFC evaluation, however, the Court addresses the ALJ's decision on grounds that go beyond the limited scope of Claimant's motion. *See JSB-1 v. Saul*, No. 3:18-cv-266, 2019 WL 2482714, at *2 n.2 (N.D.Ind. June 14, 2019) (stating that courts may *sua sponte* address issues in social security cases).

#### A.　The ALJ Improperly Evaluated Dr. Shulman's Report

An ALJ must assign specific weights to the reports of medical experts. *See David v. Barnhart*, 446 F.Supp.2d 860, 871 (N.D.Ill. 2006) ("The weight given to a treating physician cannot be implied[.]"). When an ALJ does not give a treating physician's opinion controlling weight, she must offer "good reasons" for discounting the opinion. *Larson v. Astrue,* 615 F.3d 744, 749 (7th Cir. 2010). The ALJ does so by considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion

11

was from a specialist, and (6) other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c)(2)-(6). [4]

Treating psychiatrist Dr. Shulman issued a report in July 2017 stating that Claimant suffered from a persistent depressive disorder, generalized anxiety, and a pain disorder. Claimant had become more withdrawn due to his illness and was less able to tolerate social interactions. He had poor concentration, poor task sustainability, and a poor ability to adapt to work situations due to pain and fatigue, anxiety, and depression. (R. 1226-31). The ALJ assigned "limited" weight to this report without addressing any of the regulatory factors that control the assessment of expert reports. Instead, he reasoned that Dr. Shulman's reference to limitations related to pain and fatigue was "outside the scope for which Dr. Shulman had examined and treated the claimant." (R. 21-22).

Contrary to the ALJ's reasoning, pain and the fatigue associated with it were central to Dr. Shulman's treatment of Claimant. Indeed, the psychiatrist's intake evaluation states that Claimant's primary reason for consulting him was neuralgia. (R. 294). "Neuralgia is a stabbing, burning, and often severe pain due to an irritated or damaged nerve." https://www.healthline.com/health/neuralgia (last visited Oct. 12, 2020). Claimant told Dr. Shulman that he experienced head pain that radiated "both coronally and down his neck into his arms." He also complained of fatigue that rendered him "depleted, weak, numb, and easily anxious about everything." (R. 294). Dr. Shulman prescribed Lamotrigine at Claimant's first consultation to control his "highly

---

[4] New regulations removed the treating physician rule in 2017, but only for claims filed after March 27, 2017. 20 C.F.R. §404.1527c. For claims like Claimant's that were filed before that date, the factors set out in 20 C.F.R. §404.1527 continue to apply.

reactive" central nervous system. (R. 297). He later diagnosed Claimant with a pain disorder and prescribed the narcotic pain medication Norco to help alleviate Claimant's pain.[5] (R. 306).

The record therefore refutes the ALJ's only reason for rejecting Dr. Shulman's report. On remand, the ALJ is directed to consider the record with greater care and to address all six of the regulatory factors for weighing a medical source statement if he decides that Dr. Shulman's report does not merit controlling weight.[6]

### B. The ALJ Failed to Consider All of the Relevant Evidence

Claimant further argues that remand is required because the ALJ failed to consider all of the evidence concerning his headaches. Claimant testified at the hearing that he suffered from head pain and had been treated at various pain clinics for it. The ALJ noted that Claimant stated that he experienced headaches but found that they did not constitute a severe impairment because the evidence did not show "a definitive cause" for them. (R. 18). The ALJ did not consider Claimant's headaches or any of the evidence associated with them beyond Step 2.

The ALJ's failure to consider headache pain more fully requires remand. Even if the ALJ was correct in finding that headaches were not a severe impairment – and the evidence cited

---

[5] The Court notes that Dr. Shulman was not the only expert who suggested that Claimant suffered from some form of pain disorder. Dr. Calisoff thought that Claimant might have a "diffuse myofascial pain syndrome secondary to central sensitization" – a finding similar to Dr. Shulman's concerns about Claimant's active central nervous system. (R. 476). Similarly, Dr. Lamer stated that Claimant might have a chronic pain syndrome. (R. 574). The state-agency expert Dr. Hinchen found that Claimant had a somatoform disorder. (R. 90). The ALJ overlooked all of these assessments. On remand, the ALJ should reconsider Claimant's severe and non-severe impairments at Step 2 and address these records as part of the RFC assessment.

[6] The ALJ should also re-evaluate Dr. Joseph Grasso's report. Dr. Grasso stated that Claimant could not work from January 22, 2015 onwards and that he could not lift, bend, or concentrate. The ALJ gave Dr. Grasso' report limited weight because "it is not consistent with activities performed at [that] time as noted in the record." (R. 22). However, the ALJ failed to explain what activities the record showed that Claimant did. That fails to build any bridge between the record and the ALJ's assessment of Dr. Grasso's report. In addition, the ALJ must assign a weight to Dr. Karri's report. *See David*, 446 F.Supp.2d at 871 ("The weight given to [an examining] physician cannot be implied[.]").

13

below calls that into serious question – it is well established that the ALJ must consider a claimant's severe *and* non-severe impairments throughout the decision and address the aggregate effect they have on the claimant's functioning. *See*, *e.g.*, *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2009). "A failure to fully consider the impact of non-severe impairments requires reversal." *Denton v Astrue*, 596 F.3d 419, 423 (7th Cir. 2010).

The ALJ's failure to consider Claimant's headaches more fully is puzzling because the record amply substantiates Claimant's complaints about them. Claimant travelled to Marietta, Georgia in September 2014 for headache treatment at the Carrick Brain Centers. (R. 729-38). He was later hospitalized in May 2015 for uncontrollable headache pain. (R. 533-36). In February 2017, Claimant sought treatment at the North Shore Department of Neurology. Dr. Irene Semenov diagnosed a possible chronic migraine condition and recommended Topamax. (R. 1213). She later injected him with Botox to control his headache pain. (R. 1216). "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton*, 596 F.3d at 425.

The fact that Claimant did not receive a definitive diagnosis for his headaches fails to provide any support for the ALJ's brief consideration of this issue. The fact that no doctor could diagnose the cause of Claimant's pain does not mean that it was not real. An ALJ may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p, 2017 WL 5180304, at *5. As the Seventh Circuit has explained, pain can be disabling "even when its existence is

unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004); *see also Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) ("Pain can be severe to the point of being disabling even though no physical cause can be identified[.]"); *Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010) ("It would be a mistake to say 'there is no objective medical confirmation of the claimant's pain; therefore the claimant is not in pain.'").

The pain issue was particularly important in this case because the record shows that Claimant's psychological and physical conditions were inextricably involved with one another. At the Rehabilitation Institute, for example, Dr. Calisoff recommended that Claimant spend two months working on his psychological issues before he was admitted to a pain management program because his pain appeared to be exacerbated by psycho-social factors. (R. 477, 479). Dr. Garovic at the Mayo Clinic also found that anxiety contributed to Claimant's pain and that he should undergo a psychiatric evaluation. (R. 586). Indeed, the connection between Claimant's physical and emotional condition went so far that psychiatrist Dr. Sawa noted that he showed a "near psychotic fixation on physical symptoms." (R. 490). It was this nexus between Claimant's mental and physical conditions, moreover, that was at issue in Dr. Shulman's treatment of Claimant's anxiety and neuralgia.

The ALJ's failure to consider these important issues – combined with his erroneous evaluation of Dr. Shulman's report – requires him to restate the reasons for both the symptom analysis and the RFC. The ALJ dismissed Claimant's symptom testimony "because the evidence shows some abnormalities on physical exams and diagnostic testing, but not to the extent of the claims regarding his symptoms." (R. 21). Such a summary dismissal of Claimant's testimony fails on three grounds. First, a claimant's pain cannot be set aside in this manner for the reasons just stated. *See Carradine*, 360 F.3d at 753 (stating that pain can be disabling "even when its

15

existence is unsupported by objective evidence"). Second, it is well established that an evidentiary summary is not sufficient when, as here, it leaves a court wondering how the ALJ derived his conclusions from the medical data. *See Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D.Ill. Sept. 26, 2018) ("Merely summarizing the record, however, is not in itself a substitute for an ALJ's duty to explain the basis of [his findings].").

Third, the ALJ failed to address any of the factors involved in a symptom analysis. SSR 16-3p requires an ALJ, for example, to consider a claimant's ADLs, 2017 WL 5180304, at *7, but the ALJ did not cite anything that Claimant described. In addition, an "ALJ must consider the claimant's . . . medication" as part of a symptom analysis. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). The ALJ followed that directive to a degree by noting some of the prescription drugs that Claimant took. Merely listing a claimant's medications, however, does not explain how the ALJ considered them unless the ALJ draws some connection between the medications and the symptom evaluation. *See Farley v. Berryhill*, 314 F.Supp.3d 941, 947 (N.D.Ill. 2018) (explaining that "mentioning them . . . doesn't let the reviewing court know what the ALJ thought about them and how they played into" the symptom evaluation). Claimant was prescribed at various times Elavil, Limbitrol, Lioresal, Dulcolax, Benadryl, Lomotil, Ativan, Bystolic, Norflex, Zofran, Lexapro, Cymbalta, Celexa, Valium, Mincycline, Cefuroxime, Alinia, Gabapentin, Lyrica, Tizanidine, Baclofen, prescription vitamins, Remeron, Medrol, Norco, Botox, Zoloft, Zonegran, Klonopin, Lamotrigine, Wellbutrin, and Tramadol. The ALJ was not obligated to consider all these medications, some of which addressed conditions that may not be at issue here. However, the broad scope of Claimant's medications should have reminded the ALJ that "the fact that physicians willingly prescribed drugs and offered other invasive treatment

16

indicated that they believed that claimant's symptoms were real." *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014).

The RFC analysis also fails on two grounds. "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The ALJ did not comply with this requirement when he overlooked the evidence related to Claimant's headaches and failed to consider that impairment beyond Step 2. The ALJ also gave no explanation of *how* he determined Claimant's RFC. It was not sufficient for the ALJ to state that the evidence contradicted plaintiff's testimony. SSR 96-8p requires an ALJ to provide a narrative discussion "describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." 1996 WL 374184, at *7. Even if the record arguably supports the RFC, remand is still required when an ALJ fails to carry out that obligation. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("Contrary to SSR 96-8p, however, the ALJ did not explain how he arrived at these [RFC] conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision."). Contrary to this requirement, the ALJ merely stated that the RFC "is supported by the treating source notes and overall medical evidence." (R. 22). The Court is unable to follow the basis of this reasoning: the ALJ gave little or limited weight to *all* of the treating source reports and drew no link between the treaters' notes and the RFC.

The mental RFC is especially difficult to understand. The ALJ rejected the state-agency psychologists' findings because they stated that Claimant's mental impairments were not severe. He also gave limited weight to Dr. Shulman's report. Nevertheless, the ALJ found that Claimant could still work if he were limited to simple and routine tasks, simple work-related decisions,

17

and allowed to frequently respond to supervisors and the public. The ALJ, however, provided no explanation of what part of the evidence supported his finding. As with the symptom analysis, an ALJ may not merely summarize the record without explaining in at least minimal form how the RFC was fashioned from it. *See Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480, at *4 (N.D.Ill. May 6, 2015); *Chuk v. Colvin*, No. 13 C 8409, 2015 WL 6687557, at *8 (N.D.Ill. Oct. 30, 2015). Remand is therefore required so that the ALJ can review the record with greater care and state the reasons for the symptom analysis and the RFC.

## CONCLUSION

For these reasons, Claimant's motion for summary judgment (Dckt. #13) is granted. The Commissioner's motion for summary judgment (Dckt. #21) is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) reconsider the Step 2 findings, (2) restate the reasons for the weights given to the reports of Dr. Shulman and Dr. Grasso, (3) assign a weight to Dr. Karri's report, (4) reconsider the evidence related to Claimant's headache pain, and (5) restate the reasons supporting the symptom analysis and the RFC.

_____
**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated: October 13, 2020**